As a preliminary matter, I'd like to recognize my friends from the Garland-Walker Inn of Court who were invited to observe today's oral arguments and Judge Costa and I are going to talk with them after the session is over and enjoy some food as well. And the second preliminary I'd like to make is, happy Texas Independence Day, in case you didn't know, which many of you probably did not. With that, I have a couple of, you know, the usual rules, which are that we have time limits, we have light that comes on, I think we do, that tells you when you have two minutes left and when the red light comes on, we ask you to stop talking unless you're answering a question from the court. And the other preliminary is that we have received, we have access to the record, but we may not have read the whole record, so we appreciate record citations when you're arguing. The first case of the morning is number 19-50529, Speech First, Inc. v. Fenves. So, we'll hear from Mr. Norris. Good morning. Good morning. May it please the Court. Ruling for the University of Texas in this case on either standing or mootness will create a circuit split with the Sixth Circuit. This case and the Schlissel case from the Sixth Circuit are virtually identical. The only differences between the two cases make this case easier, not harder. So in Schlissel, the University of Michigan tried to moot the case by repealing some policies in the district court, and then it never defended those policies on the merits. But here, the University of Texas has tried to moot the case by repealing some policies on appeal after it already won below to insulate that decision, and it continues in footnote 6 of its brief to defend the constitutionality of those policies. But in Schlissel, it was apparent that the litigation is what prompted the changes, because as you said, Michigan changed course basically right after the suit was brought. Here, it doesn't look like it was the litigation that prompted it. I mean, Texas won below, and the change seems to be prompted by the legislature's new law that required a bill of rights for students, and that then led the university to revise its policies. I mean, if the litigation prompted this change, wouldn't it have been like Schlissel, where the university changed course right after the suit was brought? I believe it is just like Schlissel, that the litigation did prompt these changes, Your Honor. The only policies that appear to have been repealed are the exact policies that we challenged in this case. Now, the university's brief is carefully wordsmithed about how it talks about SB 18, the bill that you referenced. But that bill did not require the university to make any of these changes. It only has two possibly relevant provisions. Subsection C of that bill says that the common outdoor areas of universities in Texas now are open to the public. That has nothing to do with any of the policies that we've challenged. We've challenged policies that apply in the dorms, online, and the verbal harassment rule, which applies everywhere on campus, not just outside. The only other possible relevant provision of SB 18 is subsection F, which requires Texas universities to adopt a policy that explains to students what their free speech rights are. But look at the intro of the university's brief. They said they've had one of those policies for years and years and years, and I agree with them. They already comply with that provision. Now, the important question for purposes of mootness is, does anything in SB 18 stop the university from reinstating these policies tomorrow? And the answer is no. There's no relevant provision in that bill. I don't think they get credit for making it seem like that bill is the reason they made these changes instead of this litigation. In fact, I think that goes to the question of good faith and whether these changes are actually genuine or not. Well, the changes aren't final in any event. That's true, I believe. Under that law, because it says they have to be approved by the regents, right? I agree, Judge Jones. The changes made under the law have to be approved by the regents, and that has not happened yet. But I don't think the university is saying, I think they're very careful about this, that the changes to the policies that we challenged even have to be approved by the regents, because those are not changes that are compliant with this measure. They were just changes done at the same time with this measure. Right. So those policies have been changed. That's already in effect. In other words, the policies we're talking about, at least the institutional policies, for example, are, as of today, not in force. Your argument is they might come back. Correct. And that's the question for voluntary cessation, yes, Your Honor. That's my understanding. At least the university can correct me if I'm wrong about that, if there's some pending approval process that may happen. But my understanding is that these policies are changed with a few clicks of a mouse by a single university administrator on a website. Now, Schlissel and other cases we've cited in our brief tell you that that kind of easily reversible change does not count for purposes of voluntary cessation. That is totally in the university's discretion. There is no procedure or policy or electoral accountability that might stop them from changing them back in the future. I just don't think the university, based on these changes, can carry its burden of proving cessation. If you end up winning this lawsuit, what do you want an injunction to say? For example, with the response team. Would it say the response teams have to be disbanded completely or would it just have certain restrictions on what they do? I think there are a couple of ways that could be structured, Your Honor. So we are challenging the university's policy on bias incidents, that is a formally defined term on their website and their policies and appears in several places. So I think either you could enjoin that definition, that policy, the definition of bias incident, which would, in effect, stop the university from logging and collecting and reporting and monitoring students who are committing for speaking that way. Or I believe this is one of those rare situations where there is essentially a police force that the only responsibility it has is monitoring bias incidents. So I do think it would be appropriate to enjoin the CCRT itself and its various functions. That's a good time to turn to the CCRT itself. I believe we all agree now that the question is whether the university's bias incidents policy, and based on the CCRT and everything used to enforce it, objectively chills speech. That is the test for purposes of Article 3 standing. We think it does. We think when you, the first thing the CCRT does is it investigates bias incidents. Now the university does not like the word investigation, but that's exactly what it's doing. It receives formal reports of bias incidents by students. It contacts the reporter within 48 hours. It interviews the reporter. It asks if there are any witnesses. It'll interview the witnesses, find out what happens, collect the facts. It will make a determination whether the situation, quote, falls within the parameters of a campus climate incident. And that's on page 316 of the record. It will make a formal determination about whether the speech met the criteria for a bias incident. They will also look to see whether it possibly violated any disciplinary rules or was a crime. And if so, we know that the CCRT will refer the bias incident and the bias offender to the disciplinary, to the dean of students who's in charge of discipline or the police as appropriate. Now the Schlissel court thought that those referrals lurked in the background of everything that the CCRT does. And I agree. That is a chilling effect on student speech. But there are no examples of such referrals at this point in time? Not correct, Your Honor. So I mean, if they were, you would have thought that a response to the Brett Kavanaugh business might have been rated sufficient for discipline. Could be, Your Honor. The problem at this stage of the litigation and why I think the law says that we can look to the policy itself to determine its chilling effect is because these records are all confidential. This is all protected by FERPA at this point. Well, that's my, I guess what's in, I don't quite understand how the CCRT works. Does it publish a periodic list of supposedly, you know, incidents that impair the community environment or what? It does a lot of things in addition to investigating and the things I mentioned before. It keeps a log on a public website. It gives each report, I think it collects all the reports of the same kind, about the same speech, puts those together, gives that an incident number, so a biased incident number. And then you can look on that website and you can see what bias was alleged, where it was alleged to have happened, what date it occurred, and then what the CCRT did in response. And it has a whole list of options that it uses to respond. And I think the referral power, you know, we're not, like I just said, we're not entirely sure when it has or hasn't been used. We'll find that out in discovery, hopefully. But I think the main way the CCRT responds to bias is by meeting with students who are accused of bias incidents. Confusingly in their brief, the university says that... I thought, I know it meets with the reporting student, but I thought, I mean, the university says that they don't meet with the person accused of the bias or harassment. They do say that. I'm very puzzled by that. The Dominguez Declaration says that the CCRT does not contact bias offenders. I think what she's... I think that's very carefully... I know Michigan's, I noted, Michigan gave the option to that person to meet with the committee or team, whatever it's called. And Judge Costa, Texas does not have a creative system. Universities across the country are doing the same thing with these bias response teams. How do you investigate? The only other way to investigate without talking to the alleged perpetrator is to get hearsay from a bunch of other people, right? Right. And that definitely occurs. So the perpetrator may have perpetrated bias without even knowing that he or she was a perpetrator. Correct, Judge Jones. That absolutely occurs. And I can point you to the record where they say they meet with the bias offenders as well. Page 345 of the record. The CCRT, quote, has educational conversations slash meetings with those initiating an incident regarding the intent and impact of their actions. Page 346 of the record. The CCRT, quote, has educational conversations or meetings with those initiating an incident, i.e. the bias offender. Page 331. The CCRT, quote, facilitates conversations between those who were targeted by and those who initiated an incident. Page 317, which is the current website, it's not even a report, it's still up today. Page 335, page 339. The CCRT supports both the student who reported the incident and, quote, the student who initiated the incident. Now, I'm mostly quoting from the 2015-16 CCRT report. That page 317 is actually from the current website. But that 2015-16 report and all the other reports that the CCRT publishes, those are on every page of the CCRT website. Those are the policies that are still in place. And Ms. Dominguez, in her declaration, says that we follow the written policies for the what we still do. And, in fact, her name is on the 2015-16 report. I'm pretty sure she helped author it. So I think what's happening with the Dominguez declaration is that they may be drawing a distinction between the CCRT itself meeting with the student and the members of the CCRT in other capacities meeting with students. Ms. Ho can correct me if I'm wrong about that, but there's obviously some sort of wordsmithing going on there because the record is extremely clear that they do meet with students. And, in fact, the district court made some conclusions of law against us, but the district court made no finding of fact that the CCRT does not meet with students. It didn't address that at all. So there's no... I want to talk about one of the other challenge policies, the institutional rules. And for standing, one of the things you have to show is that the speech your members are engaging in is arguably prohibited by the policy. And we don't have, as we've talked about, we don't have any history of how it's been enforced or certainly any evidence that's been used against your members. So take one example, I think your members say maybe they want to say we should build a wall. I'm talking about immigration policy. How does that personally describe an individual or how is it personally directed at an individual? I mean, that's just a general political comment. I have no doubt, I mean, anything you say political these days is going to upset or offend some people. But how is it personally directed at someone to say, let's build a wall? I think it depends on the context, Judge Costa. You could imagine situations where that comment could be directed at someone, you know, say people like you, Mr. College Democrat, are the reason that, you know, our country is so messed up. We need to build a border wall. I'm not exactly sure. And, you know, there are various contexts in which that could arise. But I do know that the universe... But just giving a, you know, saying that in class or putting something on your dorm wall that's the dorm door that says we should build a wall, I mean, that's just general political speech. I mean, it seems to me when they say it has to be personally directed at someone, they're excluding that type of general political comment. I think there are plenty of situations where that would feel to the complainant in a proceeding that that was directed at them. It could actually be directed at them. Is it the contention of speech first that any kind of regulation of this sort is unconstitutional or would speech first redefine what unconstitutional biased speech entails? So if we're talking about the harassment policy, we're not here challenging what the Supreme Court said that Title IX requires in the LaShonda Davis case. And it says that Title IX requires universities to be responsible for sexual harassment that is pervasive, severe, and objectively offensive, and that functionally denies a student the rights of being at the university. Well, right, but that was a physical attack, wasn't it? Correct. It was also sexual harassment. This policy that the university has, it changes about every one of those words I just mentioned to make it weaker, which is the opposite should be happening. LaShonda Davis was a fifth grader. We're talking about university students and adults here. Well, exactly. I mean, okay, so you're conceding that under that Title IX rubric, the regulation of speech on college campuses may be constitutional. Is that right? I think in extremely narrow circumstances, and none of these policies come close. What are those narrow circumstances? If you look at Justice O'Connor's definition of sexual harassment in LaShonda Davis, that sets the standard that I think... But that applies to veteran harassment, disability harassment, what was he at, cissexism harassment? You're agreeing with all that? Absolutely not, Judge Jones. The key to the LaShonda Davis definition of harassment is that it's a protected class under federal law, so there it was sexual harassment. Title VI, of course, prohibits racial discrimination. You could see policies that were drafted that way that would be constitutional, but this policy is nothing like that. And let me be clear, the verbal harassment policy is the closest they come to a constitutional policy. The other policies are nowhere near... I mean, the other point is that when you're talking about harassment by student on student, that requires a heightened level of misadventure, doesn't it? Deliberate indifference or something like that by the university about what's going on? Exactly. And to be clear, the civility, rudeness, harassment, intimidation policies, all the policies we've challenged here are content-based, viewpoint-based, restrictions on speech at a college campus where the Supreme Court has said the dictates of the First Amendment apply stronger than ever before. How do you respond to their evidence that they've actually allowed affirmative action, bake sales by conservative groups, events to support the Kavanaugh nomination, and in fact, not only do they allow the events, but they punish people who try to interfere with that expression? May I answer, Judge Costa? Sure. Yes. So two responses, Judge Costa. First, the affirmative action, bake sale, and those similar events are record-shattering reports to the CCRT, and 90% of those reports recommended that the students be disciplined and that their groups be canceled and their funding be denied. So I do think there were consequences to even that speech. But the test here for objective chill is an objective test. Judge Posner explains this pretty well in the Backpage case, that just because some students on campus are not effectively chilled, they still feel like they can engage in some protected speech and even some controversial speech. If the average college student who is in the political minority on campus and wants to say the types of things that our students want to say, it's the question as whether they feel free to speak or not, even if there are some counterexamples. Where in the record does it say that the bake sale led to a bunch of complaints that caused disciplinary referrals? I'll get back to you on that. It's either the 2014 or 2013 CCRT reports, which we cite in our brief. Just one clarifying point, was anybody disciplined for breaking up the Brett Kavanaugh tables? As far as I understand, the university's position is that one student was disciplined. I believe the video of that event is in the record. There are clearly two students who are biting and ripping and tearing up signs, and they say one student was disciplined. So I'm not sure what happens with the other student. Okay, you have time for rebuttal. Thank you. Ms. Ho. Thank you, and may it please the court. The First Amendment concerns in this case are of the utmost importance, especially on college campuses. That's probably why appellate counsel got the university to change its rules. Respectfully, Your Honor, we changed those rules, and the record is clear on that. In response to the passage of a state law, we looked at all of our policies. The state law, in addition to what my friend, who really is my friend, said today, in addition, there was also a provision of that law that required us to have in place procedures to prevent students from disrupting the free exercise of speech on campus. We're not claiming there's a one-to-one correspondence between the state law and the changes that we made. We don't need to. That was the incident that prompted us to go back and change our policies. And I would draw this Court's attention to this Court's case in Sausamon. And the facts of Sausamon are virtually identical to the facts of this case on Mootness. There, the government had defeated the plaintiff's request for an injunction below. There was no injunction in place. The government, on appeal, continued to defend the challenge policies on the standpoint that the challenge policies did not prohibit or did not embrace what was at issue there. And this Court in Sausamon said quite clearly that where the government is basically not trying to get out, we're not trying to get out of an injunction, that the government is entitled to good faith. And a critical distinction that was present in Sausamon that is not present in the Sixth Circuit decision in Schlissel, which I'll turn to next, is that the university there was not willing to say, we will not revert to the challenged policies. And here— Well, who is the university? Excuse me, Your Honor? Who is the university? Well, in this case, it is President Fenves who has been sued. Well, I'm sorry, but that's not the Board of Regents. There's no dispute, Your Honor? Ultimately, the university would be governed, as Texas law requires it here, by the Board of Regents. Yes, and that's actually a point. When my friend says that these policies can be changed at the click of a mouse, respectfully, that is not the case. That's not what happened here with respect to these policies and the changes— But if it's just the president, I mean, universities change presidents all the time, so a new president can come in and change the policies back or adopt totally different policies? The Texas law, Your Honor, actually requires the amendments to be approved by the Board of Regents. My understanding is that these policies are on the books now. They're what's governing the students, but they are also in the process of being approved. And you're right, they have not been formally approved by the Board of Regents, but in our reason to afford us why the policies were moved. Because in addition to us saying we will not, and we frankly don't think anything more is required of us than to say at this point, we will not, the university of Texas at Austin will not revert to these challenge policies. And that was entirely missing in Schlissel. And if I may turn to Schlissel— Before we do, I'm just a little confused. I thought the Board of Regents had to approve the changes that are mandated by state law, like the forum, public forum rules. But you're saying even, say, the changes to the institutional rules, the Dorham policies, those are also going to be approved? Your Honor, I would not want to speak out of school on that. What I can tell you is that the policies at issue are in the process of going through that. So whether that's legally required or not— But they're also, they've already been changed. Yes, that is correct. I mean, as of today, if I'm a student at UT— Yes, yes. If you're a student at UT, the language that they talk about in the use policy, the language that they talk about in the residence hall policy, and part of the institutional, the rules, is not in effect and is not being enforced. If I may turn back to the Schlissel case and my friend's assertion that this court would be creating a circuit split, respectfully, nothing could be further from the truth. And I think, I welcome this court taking a close look at Schlissel and at the policies at issue there, because they are starkly different. And so we think the heavy reliance on Schlissel actually helps us. Not only did Michigan's policies on their face prescribe subjective harassment, okay? The bias policy there referred to, said the most important thing in bias is how it makes you, meaning the complainant, feel. So that's a subjective harassment policy in Michigan versus creating an objectively hostile environment, which is what both versions of the policy here prohibited. I also point out that the plaintiffs there explained in their complaint not only what they were going to say and how they were going to say it, but also why the university would conclude that it violated the rules, because their fellow students would find what they wanted to say subjectively offensive, which those rules prescribed. And again, we think Schlissel is also distinguishable on mootness. There, as your honor pointed out, Michigan changed its policy mere months after the suit was filed, and here UT changed its policy after prevailing in the district court and in the ordinary course. As this court explained in Sauseman at 325 through 26, quote, the good faith nature of the plaintiff's actions there had, quote, given the plaintiff that which he did not obtain in the district court and that which there at least existed a possibility he might not have obtained here, close quote. Just so here. So speech first request to enjoin UT from enforcing rules that no longer exist is nonsensical. Is Sauseman a university case? It is not a university case, your honor. It is a prison case. Well, Schlissel takes a position that university cases should be treated a little differently because the university is not a legislative body. It is not a representative body, and therefore there's no reason to give it that kind of special treatment. Respectfully, your honor, although you're absolutely right that the Schlissel court ended up finding that the university, for various reasons that it wasn't moot, the university did not accept my friend's proposition that universities alone among government actors are not entitled to the special solicitude. We think it's moot regardless of whether you accord us. We don't die on that hill in terms of special solicitude. But we do think it's significant that the Michigan case, it certainly found that there was not mootness, but it did accept and didn't challenge the solicitude that's afforded government. But again, we don't rise or fall on that. And I think getting back, sort of getting back to the basics here, I think Article III, which is what is at stake here, prohibits courts from adjudicating pre-enforcement facial challenges like this one unless the threatened harm is certainly impending. That's glass-siding clapper, a requirement that is vital to fulfilling court's constitutional mandate to exercise jurisdiction only over actual cases and controversies. Clapper's not a First Amendment case. What's your best First Amendment case? Because the standing rules with children are the clapper. Glass. Glass is a First Amendment case. I think Glass is a First Amendment case. Zimmerman is a First Amendment case. Actually, I think some of our best cases, Your Honor, are their cases. Because I think when you look at those cases and you see what constituted a credible notice, let's take Bantam Books. In Bantam Books, First Amendment case, the plaintiffs not only had received notices from the Morality Commission, but the commission conceded it had sent notices about books that were not obscene. They essentially conceded that they were going after material that was First Amendment protected. I think O'Quadey, also a First Amendment case. There the government had sent a letter to the Billboard Company threatening prosecution. So too in this court's decision in Houston Chronicle. Now, you know better than that, Ms. Ho, that it cannot be the case that you can only protect your First Amendment rights once your First Amendment rights have been deliberately interfered with or challenged. Absolutely not. You're right. But I guess my point in these cases, Your Honor, is that you're right that, I think to use their example, that the First Amendment doesn't require you to sort of guess how many bullets are in the disciplinary gun that's aimed at you. But the gun does have to be aimed at you, and there has to be a gun in the first instance. And I think when you look at the cases where courts have found standing, it's a very high watermark even in the First Amendment context. So courts are saying no. I mean, take Steffel. I think Steffel's a great example. There you had an individual who wanted to engage in hand-billing. The police had threatened both him and a companion. His companion goes back to engage in— That's a common place in manner regulations, isn't it? No, respectfully, Your Honor, it isn't. It was a First Amendment. It was a facial challenge to the statute on its face. And the court—his companion was arrested, and he didn't hand-bill. And the court there said, quite sensibly, we're not going to say you have to go back and hand-bill to risk enforcement, risk a threat, to have standing to challenge the law on the face. But again, my friend has said, there is nothing in the record here, even about any referral. And my friend also below— What about the—he said the climate response team, there were referrals after the Kavanaugh events. Well, I think you need to distinguish between a referral and a complaint being reported. Is there any evidence that students were referred for discipline based on engaging in pro-Kavanaugh events? The students who were engaging in the pro—no, absolutely not. There is no—Your Honor, I'm going to be very clear about this. But there were incidents students said, I'm upset about this pro-Kavanaugh event, I'm reporting it. Absolutely. And I think that strengthens the veracity of what we've said in the policies, in our briefs, and here today. There—we have never, we have never investigated or prosecuted or punished a student based on speech. And my friend is correct. The only— Well, and that includes students who were disrupting other students and, you know, pulling hats off their heads or whatever. That's correct, Your Honor. And I think— But doesn't that implicitly chill the people who are expressing the alleged controversial views? Your Honor, we don't— In other words, a student, you know, they come into the Kavanaugh table and they tear up all your—they tear up all the notices of Charlie Kirk coming to speak and they tear up all the notices at your Kavanaugh table. And you don't think that has a chilling effect? Your Honor, let me—two responses to that. Number one, we don't dispute—I don't think anyone disputes that the plaintiffs—that Speech First has credibly alleged that its members are subjectively chilled. No one's disagreeing that there is a fear or a subjective fear here of what their fellow students might do. But the question in this case for standing to bring a facial challenge to the university's policies is, is there a credible— Let me ask you how the world has changed. Because I was in college at the very height of the anti-war demonstrations at Cornell, which had some of the worst in the country. And there was a lot of free speech going on, particularly on the anti-war side and to the ROTC recruiters from campus and so on. As far as I know, there was no speech policy whatsoever. What is it that has changed in the landscape of the First Amendment that allows universities in the first instance to have speech policies? Your Honor, that's a very interesting and wide-ranging question. Let me say—let me posit a couple of thoughts. And then I do want to get back to answering the question, if I may, about what happened in the wake of the events and what the record shows about it. I think one thing that I believe happened in intervening is the Supreme Court's decision in Davis. And I think my—I heard my counsel say that for purposes— from sexual abuse of a fifth grader under Title IX to regulating speech on a college campus. Your Honor, a couple of points to that. What's your best authority that that's within the scope of even, you know, Title IX? I would say—I would point out, Your Honor, that the United States—and this was cited in the briefings below—in the Michigan case, the United States filed a statement of interest in the district court in support of my friends. But the United States made very clear—and it's brief in that case, which is cited below—that universities have not only a responsibility but a legal obligation in terms of preventing harassment. Harassment can be verbal. Harassment can be physical. So we have—the United States itself, it said, we have an obligation. I don't disagree with, Your Honor, that the question of where—even Title VII and Title IX, where they may impact with the First Amendment— Well, those— But it's just not raised, Your Honor, in this case. And let me say, too, in terms of the incidents— So you're not citing a case. Is that the—you can file a 28J letter, and if you want to move on, fine. But you're not citing a case. You're not citing a specific provision of the law. And what the DOJ says in a brief, as we all know, under our—it's not entitled to much consideration. No, Your Honor, I'm just trying to give my best shot at your question about what changed in the law. And I do think what changed in the law was Davis and applying Davis to universities. I heard a university regent, not from UT Austin, but from another famous Texas university, say, oh, our basis for doing this is the bong hits for Jesus case. Well, as Your Honor knows, may know, I am usually on the other side of the V in these cases. I haven't heard that. But what I can say— I was surprised. What I can say—I find that surprising. But, Your Honor, again, I'm usually on the other side of the V in these cases. And even when you look at the record in Michigan and other cases, UT really is exemplary in its policies and also how it responds. And I think this leads me back to responding to the question about how the university responded. The university police stepped in at the Kavanaugh event and at the Charlie Kirk event when the disruptors resorted to physical contact, when a Make America Great hat was snatched off someone's head, and when water was thrown at Charlie Kirk's cameraman. So, again, Your Honor, even—so, first of all, the university is not going to stand by and allow speakers to be subject to a heckler's veto. But it's also going to respect the rights of the counter-protesters to speak their piece. Stepping in, though, when the line is crossed from free speech to physical conduct. And I think that's important. Go back to the climate response team and the standing question. Because it seems like—so you agree that speech like these students want to make, that the plaintiffs' members want to make, does lead to a number of incident reports being filed. The Kavanaugh—you said after the Kavanaugh event and the affirmative action bake sale, there were students were filing incident reports with the response team, correct? I know that the record is clear that in the wake of a seminar, it was considered a pro-Israel seminar, Palestinian students protested. And that was sort of the high watermark for, yes, for people filing or making, filing a report with the CCRT. So it seems like there they do show that there's a credible fear that their speech will at least lead to other students filing reports on them. So your response is those reports don't lead to any punishment? I mean, what— Sure. I think—and let me be clear. I mean, even if the CCRT disappeared tomorrow, nothing would certainly prevent filing reports. I don't think they hang their hat on that. Who is this formal mechanism for filing complaints that might make students more fearful? There's a whole apparatus in place for dealing with these types of complaints. Two points. Two points to that. I think first I would point to the Supreme Court's decision in Laird v. Tatum, where there was no question that the Army had this intelligence-gathering apparatus. The dissent in that case actually pointed out that the plaintiffs there, actually there was evidence that they had had information on them in it, and the Supreme Court said no, the mere existence of this investigatory apparatus does not rise to the level of chilling. As to your other question about that, I think the chain of contingencies, and I heard my friend talk about it, that falls afoul of glass. This court held in glass, it's a First Amendment case, that each link in that chain, the harm needs to be certainly impending. So for the harm to materialize here, not only do the fellow students need to file a report with the CCRT, that's step one, but the CCRT must determine that the report qualifies as a campus climate incident, that's step two. The CCRT must decide to refer the incident to the dean of students, that's step three, who must then determine that the actions violated university policy, that's step four. You're saying they basically have to prove liability in order to prove standing, at the preliminary injunction stage? Is that what you're saying? No, Your Honor. I am saying at the preliminary injunction stage, they have to make a clear showing of standing, and glass itself was, I believe, a preliminary injunction case. It's just far too attenuated a chain of contingencies to support a pre-enforcement challenge under Clapper and Glass, and I see my time has expired. Thank you very much. Mr. Norris? Thank you, Your Honor. Just a few points in reply. Judge Jones would pick up where you left off. The question here is whether we have Article III standing. We're not talking about the merits of these policies and the best way to interpret them. The question is whether we're arguably correct about what they do and whether our students are reasonably chilled by them. And it's not just standing, it's likely standing. We're at the preliminary injunction stage here. There's not been discovery yet. What's this Glass case that she's citing? I'm not familiar with the facts of that case, Your Honor, but we know in the First Amendment context, we've cited Legion cases, that there is a credible threat of enforcement from the text of the policy. You don't need to prove a history. The text, when it arguably applies to your speech, students reasonably assume that that policy is going to be applied, especially if the policy was enacted recently. We cite this case, 281 Care, out of the Eighth Circuit. It says if you just enacted the policy, of course there's no history yet. These policies that we're challenging are just a few years old. That is a credible threat of enforcement. That's enough for standing. When did they go into effect? The various policies here. The technology policy was 2015. The other policies are all 2018, as of the time we filed our complaint. Were the response teams, they never existed before 18, or they were just modified? It was created in 2012, and those policies have been more organic, but we cited the websites as they existed when we filed our complaint in 2019. If you have any questions about the biased response team, I think there's a useful thought exercise to do there. The university's position is that this does not even implicate the First Amendment at all, not at all, and we don't even have standing to challenge it, which means they think you could substitute the University of Texas for the city of Austin and have the exact same policy in place. I think that's much more clearly a chilling effect when you think about it that way. They also think you could substitute the word bias for anything. So say they created a libertarian response team, and they said that their mission is to eliminate libertarianism on campus, and that if they see any libertarians, you need to report them to the university, and they will investigate what happened. They will talk to the witnesses. They will figure out what's going on. They will make a determination about whether that libertarian needs to be referred to the disciplinary community, to the disciplinary authorities. They will log that libertarian on a public website. To the university, that's the exact same thing, except you just sub the speech that they disfavored. Now, a couple other things. Judge Costa, the affirmative action bake sale is in the 2013-14 CCRT report. That's cited on page 13 of our brief. And I just want to correct this notion that the University of Texas is an exemplary university when it comes to free speech. The University of Texas has received a red light rating from FIRE, which is a First Amendment watchdog group, for over a decade. They're considered one of the 50 worst universities in the country, and they've been that way for a long time. That's part of the reason we brought this to you. They have some of the worst policies on the books, and I've never heard a defense as to why it's consistent with the First Amendment to ban uncivil speech or rude speech or intimidating speech or cissexist speech or speech that denies the individuality of another, or how, if the biased incident definition was in the disciplinary code, how that could possibly be constitutional. It's content-based, viewpoint-based discrimination. Lastly, I just want to say a few things about mootness. The key question is not what the university did to change the policies, but what stands in the way to stop the university from unchanging them. That's the question for voluntary cessation, and there are no requirements stopping the university from changing these policies back. My friend, and I also mean the term my friend, says that they did this consistent with the bill, but there's no commitment that the bill required them to do this or stops them from undoing it. There's also no commitment that the Board of Regents will even approve these changes, much less would have to approve them going back. There's no requirement in the law. There, you can look at the statute yourselves. And the key difference between this case and the Sossaman case that you heard a lot about is there, there was a formal statewide change to policies for the prisons. Here, it's just the university's sole discretion, and here, the university says that if we ever did go back to those old policies, those old policies are perfectly constitutional, and no one has any standing to challenge them. So I question what barrier there is to the university returning to those policies tomorrow. They don't think there's anything anyone can do about it, and there's nothing standing in their way. Well, they couldn't do it pre-enforcement. I'm sorry, Judge Jones? They couldn't do it pre-enforcement. Right. They believe there's no such thing as a pre-enforcement facial challenge to their policies. It's basically impossible, which I could cite to you, and we did in our brief, Legion speech code cases that were brought in this exact posture, and that was never how they were decided. They were decided on their merits. I think the university's argument is that SB 18 inspired these changes but did not require these changes, and that's simply not enough for voluntary cessation. And, in fact, if I could make just one last point, there is, unlike the rest of these voluntary cessation cases that my friend cited, there is no declaration in the record from any university official about their future intentions. There is just a statement in an appellate brief. Thank you. Okay. Thank you very much.